Case No. 18-1162

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

JOHN DOE
Plaintiff-Appellant,

vs.

UNIVERSITY OF DENVER; UNIVERSITY OF DENVER BOARD OF
TRUSTEES; REBECCA CHOPP, individually and as agent for UNIVERSITY OF
DENVER; KRISTIN OLSON, individually and as agent for UNIVERSITY OF
DENVER; JEAN MCALLISTER, individually and as agent for UNIVERSITY OF
DENVER; KATHRYNE GROVE, individually and as agent for UNIVERSITY OF
DENVER; and ERIC BUTLER, individually and as agent for UNIVERSITY OF
DENVER,
Defendants-Appellees.

On Appeal from the United States District Court, District of Colorado
The Honorable Judge Philip A. Brimmer
District Court No. 1:16-cv-00152-PAB-STV

## APPELLEES' RESPONSE BRIEF

## ORAL ARGUMENT IS NOT REQUESTED

Jim Goh
E. Rayner Mangum
**CONSTANGY, BROOKS, SMITH &
PROPHETE, LLP**
600 17th Street, Suite 2700-S
Denver, CO  80202
Telephone:  720.343.7533
Facsimile:   720.343.7573
**ATTORNEYS FOR APPELLEES**

## CORPORATE DISCLOSURE STATEMENT

Colorado Seminary owns and operates Appellee, the University of Denver ("DU"), a non-profit Colorado corporation. No publicly held corporations own 10% or more of DU's stock. Appellees Rebecca Chopp, Kristin Olson, Jean McAllister, Kathryne Grove, and Eric Butler are individuals to whom Rule 26.1 of the Federal Rules of Appellate Procedure and Tenth Circuit Rule 26.1 do not apply.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT……………………………………..i

TABLE OF CONTENTS…………………………………………………………..ii

TABLE OF AUTHORITIES……………………………………………....vi

STATEMENT OF RELATED CASES…………………………………..1

STATEMENT OF THE CASE………………………………………………1

    1.    John Doe's Familiarity with DU's Office Of Equal Opportunity Procedures…………………………………………….………1

    2.    Jane Doe's Report of Sexual Misconduct……………………..2

    3.    Investigation………………………………………………….3

    4.    Outcome Council………………………………………….7

    5.    Appeal………………………………………………….8

SUMMARY OF THE ARGUMENT……………………………………9

ARGUMENT……………………………………………...………10

I.    SUMMARY JUDGMENT STANDARD AND WAIVER…..…………10

    A. Summary Judgment Standard………………………………...10

    B. Waiver…………………………………………………..11

II.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT AND DISMISSED JOHN'S TITLE IX DISCRIMINATION CLAIM …………………..…………………12

ii

A. Title IX Discrimination Law in College Disciplinary Cases………...13

B. A Reasonable Jury Could Not Find that DU was Motivated by Gender Bias…………………………………………..…………………14

    1. DU is Not Responsible for the Gender Makeup of Students Who Are Accused by Other Students of Sexual Misconduct………..14

        a) The District Court Properly Characterized John's Case..…14

        b) The Proportion of Female Complainants/Male Respondents Does Not Create an Inference of Gender Bias……………..…15

        c) Compliance with the April 2011 Dear Colleague Letter Does Not Raise an Inference of Discrimination…………..…..…17

    2. DU's Purported Encouragement of Sexual Misconduct Reporting Does Not Equate to Bias Against Males……………………..…19

        a) An Alleged Poster Stating "If You Regret It, It Was Rape" Does Not Demonstrate Gender Bias………………….……20

        b) John's Argument that Males Are Disproportionally Impacted is a Non-Cognizable Disparate Impact Theory……….…...22

    3. John is Unable to Establish An Inference of Gender Bias from DU's Training Materials.……………………………………..…22

        a) The District Court Properly Considered and Rejected John's Evidence Under the Totality of the Circumstances………..22

        b) The Record on Training Demonstrates There Was No Gender Bias in DU's Training Materials………………....…..…..23

        c) The Cases Cited by the District Court Were Directly On Point……………………………………….……….…25

    4. The Resources DU Provided to Complainants and Respondents Do Not Show Gender Bias.……………………….…………27

    5. Investigators Were Not Biased Against John Because He Is Male……………………………………………………….28

iii

   a) *Doe v. Columbia* Does Not Advance John's Arguments….30

   b) The Gruber Report's Discussion of Alleged Investigative Flaws Does Not Raise an Inference of Gender Bias………31

  6. John's Expulsion Does Not Raise an Inference of Gender Bias…………………………………………………….. 33

   a) The District Court Did Not Require John to Show Female Respondents for Comparison……………………...…..34

  7. Even Under the Totality of the Circumstances, John Failed to Show Gender Bias. ………………………………….………35

 C. John Waived Arguments of Gender Bias Under the Gruber Report, and Gruber's Fitness as an Expert is Not at Issue on Appeal……..……35

  1. Waiver……………………………………………………….35

  2. There is No Issue on Appeal Regarding the Admissibility of Gruber's Testimony……………………………………….37

 D. The District Court's Ruling on Discretion Was Proper. …………...38

III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON JOHN'S CONSTITUTIONAL DUE PROCESS CLAIM. ……………………………………………………………39

 A. The Law Governing When Private Parties Are State Actors for Due Process Purposes……………………………………………………40

 B. DU Was Not Delegated a Public Function Traditionally Exclusively Reserved to the State………………………………………..……41

  1. John Waived His Delegation Argument…………….……...41

  2. Prosecution is Not a Public Function Traditionally Reserved to the State Exclusively……………………………………..…………41

  3. There Has Been No Delegation of the State's Prosecutorial Function to DU………………………………….…………42

iv

4.   John's Additional State Action Arguments Fail………….…..44

    a)   Actions by the Federal Government Are Irrelevant to John's Fourteenth Amendment Claim……………………….…44

    b)   The Receipt of Federal Funds and the Risk of Defunding Do Not Establish State Action………………………...…..45

    c)   The Proper Application of the Law Demonstrates That There Was No State Action…………………………….…..…49

    d)   The Cases Cited by the District Court Are Directly On Point……………………………………………..……....52

    e)    John's "It Just Cannot Be" Policy Argument Also Fails….54

C.   The District Court Properly Declined Supplemental Jurisdiction Over John's State Law Claims…………………………………..…..55

CONCLUSION………………………………………………………..…55

CERTIFICATE OF COMPLIANCE……………………………………..56

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS……………………………………………………....57

CERTIFICATION OF IDENTICAL HARD COPIES……………….…..……….58

CERTIFICATE OF VIRUS SCAN……………………………………59

CERTIFICATE OF SERVICE……………………………………….....60

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Alexander v. Sandoval*, 532 U.S. 275 (2001).................................................... 17, 22

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999)........................................40

*Anschutz Land and Livestock Co., Inc. v. Union Pac.*, 820 F.2d 338
    (10th Cir. 1987).................................................... 11, 24, 32, 37, 41

*Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214 (D. Or. 2016)...................... 18, 19

*Baca v. Sklar*, 398 F.3d 1210 (10th Cir. 2005)................................................ 11, 21

*Bleiler v. Coll. Of the Holy Cross*, 2013 WL 4714340
    (D. Mass. Aug. 26, 2013) .......................................... 24, 25, 26, 27

*Blum v. Yaretsky*, 457 U.S. 991
    (1982)………………………………………………..…40, 45, 46, 47, 48, 51

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*,
    531 U.S. 288 (2001).................................................... 40, 51

*Browns v. Mitchell*, 409 F.2d 593 (10th Cir. 1969)................................................44

*Davis v. Simon Prop. Grp.*, 9 F. App'x 876 (10th Cir. 2001) ................................11

*Doe v. Case W. Res. Univ.*, 2017 WL 3840418
    (N.D. Ohio Sept. 1, 2017)............................................. 46, 47, 54

*Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939
    (N.D. Ill. 2017)………………………………......…17, 20, 21, 22, 24, 25, 27

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) .......................... 26, 30,  31, 39

*Doe v. Cummins*, 662 Fed. App'x 437 (6th Cir. 2016).............................. 16, 17, 19

*Doe v. Purdue Univ.*, 281 F. Supp. 3d 754  (N.D. Ind. 2017).............. 16, 17, 30, 34

*Doe v. Regents of the Univ. of California,* 2016 WL 5515711
(C.D. Cal. July 25, 2016) ........................................................................ 16, 17

*Doe v. The Rector & Visitors of George Mason Univ.*,
179 F. Supp. 3d 583 (E.D. Va. 2016). .................................................... 43, 44

*Doe v. Trs. of Boston Coll.*, 892 F.3d 67 (1st Cir. 2018) ......................................... 13

*Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D. Ohio 2016) ...................... 24

*Doe v. Univ. of Colorado* 255 F. Supp. 3d 1064
(D. Colo. 2017) ……………………………………………...16, 18, 19, 26, 27

*Doe v. Washington & Lee Univ.*, 2015 WL 4647996
(W.D. Va. Aug. 5, 2015) ................................................................ 21, 47, 54

*Faparusi v. Case W. Res. Univ.*, 711 Fed. App'x 269
(6th Cir. 2017) ................................................................................ 46, 47, 53

*Flagg Bros. v. Brooks*, 436 U.S. 149 (1978) ........................................................... 48

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442
(10th Cir. 1995) ............................................................................................. 41

*Harte v. Comm'r*, 864 F.3d 1154 (10th Cir. 2017*)* ................................................. 11

*Heineke v. Santa Clara Univ.*, 2017 WL 6026248
(N.D. Cal. Dec. 5, 2017) ................................................... 46, 47, 51, 52, 53

*Hutchinson v. Pfeil*, 2000 WL 345688 (10th Cir. Apr. 4, 2000). ........................... 12

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974) ....................................... 41, 42

*James v. Grand Lake Mental Health Ctr., Inc.*, 1998 WL 664315
(10th Cir. Sept. 24, 1998). ............................................................................. 49

*King v. DePauw University*, 2014 WL 4197507
(S.D. Ind. Aug. 22, 2014) ............................................................................. 16

*Llewellyn v. Allstate Home Loans, Inc.* 711 F.3d 1173 (10th Cir. 2013) ......... 11, 21

vii

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ..................................45

*Peak ex rel. Peak v. Cent. Tank Coatings, Inc.*, 606 F. App'x 891
    (10th Cir. 2015) ...........................................................................38

*Pioneer Centres Holding Co.v. Alerus Financial, N.A.*, 858 F.3d 1324
    (10th Cir. 2017) ................................................................... 10, 11

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) .................................... 40, 44

*Rochez v. Mittleton*, 839 F. Supp. 1075 (S.D.N.Y. 1993) .......................42

*Sahm v. Miami Univ.*, 110 F. Supp. 3d 774 (S.D. Ohio 2015) ...............27

*Smith v. Palafox*, 728 F. App'x 270 (5th Cir. 2018) ...............................38

*States v. Mejia*, 545 F.3d 179 (2d Cir. 2008)..........................................38

*Sutton v. Providence St. Joseph Medical Ctr.*, 192 F.3d 826 (9th Cir. 1999) .........53

*Tele-Communications, Inc. v. C.I.R.*, 104 F.3d 1229
    (10th Cir. 1997)…………………………………………...11, 12, 24, 32, 37, 41

*Toth v. Gates Rubber Co.*, 216 F.3d 1088, 2000 WL 796068
    (10th Cir. June 21, 2000) ................................................................12

*Tsuruta v. Augustana Univ.*, 2015 WL 5838602
    (D.S.D. Oct. 7, 2015)............................................................. 46, 53

*United States v. Dunkel*, 927 F.2d 955 (7th Cir. 1991) ...........................12

*West v. Atkins*, 487 U.S. 42 (1988) ........................................................40

*Wilburn v. Mid-S. Health Dev., Inc.*, 343 F.3d 1274 (10th Cir. 2003) ............. 50, 51

*Woytowicz v. George Washington Univ.*, 2018 WL 4078352
    _ F. Supp. 3d._  (D.D.C. Aug. 27, 2018)................................. ……47, 49, 51

*Yu v. Vassar College*, 97 F. Supp. 3d 452 (S.D.N.Y. 2015).................. 28, 30, 34 39

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994)............................................ 13, 14

**Statutes**

20 U.S.C. § 1681(a) ...............................................................................13

42 U.S.C. §1983.....................................................................................44

**Other Authorities**

Roger A. Fairfax, Jr., *Delegation of the Criminal Prosecution Function*, 43 U.C. Davis L. Rev.  411, 413-15 (2009) ..............................................................42

Second Amended Complaint, *Doe v. DiStefano*, 2017 WL 6210551 ....................27

U.S. Department of Education Office for Civil Rights, Apr. 4, 2011, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf...43

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF THE CASE

### 1.    John Doe's Familiarity With DU's Office of Equal Opportunity Procedures

In the Fall quarter of 2014, Appellant John Doe ("John") enrolled in the undergraduate program at DU, a private not-for-profit university.  (Aplt. App. at A172, A1489.)[1]    John was "familiar with DU's policies concerning sexual misconduct" and understood that non-consensual sexual contact was a policy violation that would typically result in dismissal.  (Aplt. App. at A154-A155, A1489-1490.)

DU's Equal Opportunity procedures defines non-consensual sexual contact as "any intentional sexual touching, however slight, with any object, by any individual upon any individual that is without consent; by force, coercion or threat; or where that individual is incapacitated.  (Aplt. App. at A140.)

DU's Equal Opportunity procedures define coercion as follows:

Coercion is unreasonable and persistent pressure to compel another individual to initiate or continue sexual activity against an individual's will. . . . When someone makes clear that they do not want to engage in sexual contact, that they want to stop . . . continued pressure beyond that point can be coercive.  A person's words or conduct are sufficient to constitute coercion if they wrongfully impair another individual's

---

[1] Throughout this brief, DU cites to the Appellant's Appendix as "Aplt. App." and to Appellees' Supplemental Appendix as "Aplee. Supp. App."

freedom of will and ability to choose whether or not to engage in sexual activity. . .

(Aplt. App. at A139.)

### 2.    Jane Doe's Report of Sexual Misconduct

On April 15, 2015, DU Graduate Resident Director Jeffrey Mariano received a report that John engaged in non-consensual sexual contact with Jane Doe ("Jane"). (Aplt. App. at A356-A357, A363-A365.)  Mariano sent an email notifying a number of DU's administrative personnel, which was subsequently forwarded to Kathryne Grove (Director of the Office of Equal Opportunity ("OEO") and Title IX Coordinator), and Molly Rossi (OEO Investigator).  (Aplt. App. at A190, A356-357, A364-A367.)

On April 24, 2015, DU's Campus Safety Office met with Jane to discuss her report of non-consensual sexual contact.  (Aplt. App. at A199-A200.)  On April 27, 2015, the Associate Director of Campus Safety sent Grove, Rossi, and Eric Butler (OEO Investigator) Campus Safety's Offense Report concerning John's alleged misconduct. (Aplt. App. at A199, A200.)

On May 1, 2015, Grove and Butler ("the Investigators") met with Jane for an informational meeting to discuss the OEO process.  (Aplt. App. at A201, A222); (Aplee. Supp. App. at A1747.)  Both Grove and Butler are lawyers by training and understand Title IX law and evidentiary standards, including the preponderance of

the evidence standard. (Aplee. Supp. App. at A1727-A1728, A1735, A1742-A1744, A1745-A1746.)

As a former Student-Conduct Officer at Duquesne University, Eric Butler facilitated over 120 student-conduct proceedings, was familiar with student grievances and disposition reports of student-conduct cases, and was also a member of the hearing board for student-conduct appeals by non-resident students. (Aplt. App. at A174.) Eric Butler has participated in "[a] lot of training regarding [his] work . . . in both workplace investigations and student investigations regarding harassment, discrimination, and violence . . . including gender violence." (Aplt. App. at A177-A179.); (Aplee. Supp. App. at A1730.)

Kathryn Grove has worked in the field of non-discrimination law since 2004; "[her] entire career as an attorney has [entailed] collection of information, evaluating information, conducting reviews and . . . conducting investigations." (Aplt. App. at A342-A344.); (Aplee. Supp. App. at A1742.)

### 3.    Investigation

On May 5, 2015, the Investigators commenced their investigation by interviewing Jane regarding the alleged misconduct. (Aplt. App. at A223-225.)

For each interview conducted by the Investigators in this case, the Investigators created "summary statements" by transcribing contemporaneously what was being said by each interviewee. (Aplt. App. at A1494.); (Aplee. Supp.

3

App. at A1729, A1731, A1748-1749.)  Each interviewee was then provided with his or her Summary Statement after the interview and was provided time to make any edits to ensure the Summary Statement was accurate.  (Aplt. App. at A1494, 1495.); (Aplee. Supp. App. at A1729, A1750.)

On May 11, 2015, the Investigators interviewed John's roommate, M.F. (Aplt. App. at A226.)

The next day, on May 12, 2015, Butler sent John a letter notifying him that "an expression of concern has been filed that [John had] allegedly committed the following prohibited contact: Non-Consensual Sexual Contact."  (Aplt. App. at A255-A257.)  The letter also listed John's rights and responsibilities and attached a list of resources available to him as a respondent to the complaint. (Aplt. App. at A255-A262; A351-A352.)

On May 13, 2015, the Investigators interviewed J.M., a mutual acquaintance of John and Jane who was in John's dorm room the night of the alleged misconduct. (Aplt. App. at A229-A230.)

The Investigators then contacted John for an informational interview, but the interview was delayed until May 20, 2015 because John needed time to engage a lawyer to accompany him in the interview as a support person.  (Aplt. App. at A1492-A1493); (Aplee. Supp. App. at A1733, A1752.) The investigative interview

with John took place on May 27, 2015.  (Aplt. App. at A231.)  John provided the Investigators with a list of witnesses.  (Aplt. App. at A231, A1502.)

The Investigators subsequently prepared a Summary Statement of John's interview.  (Aplt. App. at A231.)  John reviewed his Summary Statement, provided comments and input, and made revisions to ensure the statement accurately reflected his version of the events.  (Aplt. App. at A231, A1495.)

On May 28, 2015, the Investigators interviewed Jeffrey Mariano, and on May 29, 2015, the Investigators interviewed R.H., who was with Jane when she reported the alleged misconduct to Mariano.  (Aplt. App. at A236, A238.)

The Investigators then conducted supplemental interviews of: Jane on May 29, 2015; Mariano on June 1, 2015; John on June 15, 2015; and John's roommate on June 16, 2015.  (Aplt. App. at A240, A243, A244, A248.)  John's supplemental interview was delayed because his lawyer/support person was unavailable until June 15, 2015.  (Aplt. App. at A246, A1496.)

On June 26, 2015, the Investigators issued a Preliminary Report to John and Jane.  (Aplt. App. at A543.)  The Preliminary Report is "the first time any party gets to see the written summary statement of any other party or witness."  (Aplee. Supp. App. at A1734.)  The Preliminary Report did not contain DU's findings and conclusions, as John and Jane still had the opportunity to make further revisions to their respective summary statements.  (Aplt. App. at A249-A251.)

5

Eric Butler notified both John and Jane that, "[u]pon reviewing the report, you may submit additional relevant information or corrections to me via email." (Aplt. App. at A249-A251.) On July 2, 2015, Jane responded to Butler, stating that she reviewed the report and had "nothing to add at this point." (Aplt. App. at 249.) On July 3, 2015, John responded to Butler, stating that he had a "slight edit" to the Preliminary Report. (Aplt. App. at A250-251.)

On July 14, 2015, the Investigators issued a Final Report containing summaries of information provided by witnesses and DU's findings and conclusions as to whether the facts established a violation of the University's Equal Opportunity policies on non-consensual sexual contact based on coercion. (Aplt. App. at A108-A109.) The Final Report states: "[T]he investigators find it more likely than not that [John's] actions on the night of October 9, 2014 resulted in non-consensual sexual contact with [Jane] by means of coercion in violation of the University's Equal Opportunity policies." (Aplt. App. at A109.)

On July 15, 2015, Butler sent a letter to John that reiterated the Investigators' finding of responsibility. (Aplt. App. at A159-A160.)

Jean McAllister, who started at DU in June of 2015 as the Director of Title IX, had no involvement in the investigation. (Aplt. App. at A254, A354, A430.) As a new employee at DU, her only involvement in this matter was to read the Final Report as a "training exercise." (Aplt. App. at A254, A430.) She provided no input

6

into any aspect of the investigation, including the findings and conclusions. (Aplt. App. at A254, A354, A430.)

### 4.     Outcome Council

On July 17, 2015, Kristin Olson, DU's Director of Student Conduct, sent a letter to John explaining that because the OEO found John responsible, an Outcome Council would be convened to determine the appropriate sanction. (Aplt. App. at 161.)  The letter identified each member of the Outcome Council and explained John's right to "object to the participation of a member of the Outcome Council based on a demonstrable significant bias."  (Aplt. App. at A161-A162.)

Prior to the Outcome Council process, John had no dealings with Molly Hooker or Matthew Rutherford, members of the Outcome Council. (Aplt. App. at A1503-A1504.)  John also had no interaction with Olson prior to Jane's report of sexual misconduct.  (Aplt. App. at A1500.)  John had no reason to believe that any member of the Outcome Council harbored any gender bias against him.  (Aplt. App. at A1500, A1503-A1504.)

Olson did not discuss the Final Report with Grove, Butler, or McAllister, and the Outcome Council members do not discuss the substance of a case with each other prior to their formal meeting to discuss potential sanctions.  (Aplt. App. at A354); (Aplee. Supp. App. at A1732, A1738, A1739, A1751.)

7

On July 20, 2015, the Outcome Council convened and, after discussing the applicable criteria under DU's policies, determined that "it is in the University's best interest to remove the student respondent, John, from the campus community due to the nature and severity of John's actions and in an effort to protect the community. Therefore, the Council is issuing John a dismissal from the University." (Aplt. App. at A163.) On July 22, 2015, Olson notified John of the Outcome Council's decision via phone and in a written letter. (Aplt. App. at A163-164, 1501.); (Aplee. Supp. App. at A1740.)

### 5.    Appeal

On July 27, 2015, John submitted an internal appeal, in which he alleged that the Investigators failed to: (1) include information that he provided them in the investigative report, (2) properly investigate and collect all available information, and (3) ensure proper investigatory techniques were followed and/or give weight or consideration to the fact that they were not followed. (Aplt. App. at A165.)

On July 30, 2015, Barbara Wilcots, Associate Provost of Graduate Studies, sent a letter to John, informing him that his appeal was denied and outlining the rationale for her decision. (Aplt. App. at A168-A170.) This was a final decision by DU "with no further route of appeal." (Aplt. App. at A168-A170.)

Chancellor Chopp had no involvement in any aspect of John's investigation, outcome determination, or appeal. (Aplee. Supp. App. at A1727, A1737.)

## SUMMARY OF THE ARGUMENT

**Title IX Discrimination.**  The District Court properly granted DU's Motion for Summary Judgment after determining that John failed to raise an inference of gender bias to support his Title IX claim.  As the District Court correctly determined, John's efforts to show gender bias are based on flawed arguments that: (1) erroneously equate alleged bias in favor of sexual misconduct *complainants* with bias against *males*, (2) represent non-cognizable disparate impact theories, whereby DU would be liable under Title IX simply because male students are disproportionately accused by other students of sexual misconduct; and (3) reflect nothing more than John's disagreement with DU's determination that he violated the University's Title IX policies.  John's attempt, on appeal, to bolster his evidence of gender bias by relying on the Gruber Report is unavailing because he never presented those arguments to the District Court—thereby waiving those arguments here—and expert opinions cannot take the place of admissible, credible evidence to defeat summary judgment.

**Due Process.** The District Court correctly granted summary judgment on John's Fourteenth Amendment constitutional due process claim.  John's argument that state action is present because DU was delegated the State's traditional public function of adjudicating sex crimes is waived because John failed to present it to the District Court below.  Even if the argument is not waived, it is meritless because: (1)

9

the prosecutorial function has not been traditionally exclusively reserved to the State, as is required to establish state action under a delegation theory, and (2) DU's Title IX determinations of violations of its own sexual misconduct policies would not represent a "delegation" of that authority in any event.  John's additional argument that state action is present due to DU's receipt of federal funds which require compliance with Title IX also fails.  Federal funding and federal actions are entirely irrelevant to John's Fourteenth Amendment claim (which challenges actions of the State, not the federal government).  Moreover, as courts around the country have uniformly concluded, the federal government requiring compliance with Title IX does not turn private universities into state actors.

**State Law**. The District Court properly granted summary judgment on John's state law claims for lack of jurisdiction because the federal law claims were correctly dismissed on summary judgment.

## ARGUMENT
## I.

### SUMMARY JUDGMENT STANDARD AND WAIVER

#### A. Summary Judgment Standard

Summary judgment is appropriate when the Plaintiff has failed to present evidence that would be sufficient for the jury to find in his favor.  *Pioneer Centres Holding Co. v. Alerus Fin.*, 858 F.3d 1324, 1334 (10th Cir. 2017), *cert. dismissed sub nom. Pioneer Centres Holding v. Alerus Fin.*, No. 17-667, 2018 WL 4496523

(U.S. Sept. 20, 2018).  In ruling on summary judgment, the court does not have to "make unreasonable inferences in favor of the non-moving party*,*" or "adopt one party's version of the facts if the record doesn't support it."  *Llewellyn v. Allstate Home Loans, Inc.* 711 F.3d 1173, 1187 (10th Cir. 2013) (citation omitted); *Harte v. Comm'r*, 864 F.3d 1154, 1173 (10th Cir. 2017*); see also Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005) ("Mere allegations unsupported by further evidence . . . are insufficient to survive a motion for summary judgment.").  An inference is unreasonable if it requires "'a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'"  *Pioneer Centres,* 858 F.3d at 1334 (citation omitted).

This Court may affirm the District Court's grant of summary judgment on any basis the record supports, even one the district court did not rely on.  *E.g.*, *Davis v. Simon Prop. Grp*., 9 F. App'x 876, 880 (10th Cir. 2001).

## B. Waiver

Absent extraordinary circumstances, an appellate court generally will not consider an argument raised for the first time on appeal.  *Tele–Communications, Inc. v. Commissioner of Internal Revenue*, 104 F.3d 1229, 1232 (10th Cir. 1997).  The rule is particularly apt with an appeal from a grant of summary judgment because the material facts are not in dispute and the district court judge considers only opposing legal theories.  *Anschutz Land and Livestock Co., Inc. v. Union Pac*., 820

F.2d 338, 344 n.5 (10th Cir. 1987). "Propounding new arguments on appeal in an attempt to prompt [appellate courts] to reverse the trial court undermines important judicial values." *Id.*

As this Court has stated, an appeal should not be considered a "'second-shot' forum, a forum where secondary, back-up theories may be mounted for the first time." *Tele-Communications, Inc.*, 104 F.3d at 1233. Instead, parties must be encouraged to "'give it everything they've got' at the trial level." *Id.* Therefore, an issue must be "'presented to, considered [and] decided by the trial court' " before it can be raised on appeal." *Id.* (citation omitted); *see also Toth v. Gates Rubber Co.*, 216 F.3d 1088, 2000 WL 796068, at *8 (10th Cir. June 21, 2000) ("Judges are not like pigs, hunting for truffles buried in briefs.") (*quoting United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). The rule against introducing new arguments on appeal is implicated whenever a party attempts to reconfigure the dispute on appeal, "whether the attempt is made through the introduction of new issues, arguments, theories, or claims." *Hutchinson v. Pfeil*, 2000 WL 345688, at *1 (10th Cir. Apr. 4, 2000).

## II.

## THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT AND DISMISSED JOHN'S TITLE IX DISCRIMINATION CLAIM.

The District Court properly granted summary judgment after determining that John failed to raise an inference that gender bias was a motivating factor behind

DU's decision to expel John for engaging in sexual misconduct. (Aplt. App. at A1479.) As discussed below, John's evidence falls far short of demonstrating that the University's decision was motivated by gender bias.

## A.    Title IX Discrimination Law in College Disciplinary Cases

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There are two main types of claims a plaintiff may assert under Title IX with respect to claimed discrimination by a university arising from its disciplinary hearings: (1) erroneous outcome, and (2) selective enforcement. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). Both standards require the Plaintiff to ultimately establish that the education institution's actions were motivated by sex-based discrimination. *Id.* Plaintiff's claim is that of erroneous outcome. *E.g.*, John's Brief, at 1.

"Erroneous outcome" involves a claim that the plaintiff was innocent of the charges presented and wrongly found to have committed an offense in an educational institution's disciplinary proceedings. *Yusuf*, 35 F.3d at 715. Under this theory, Plaintiff must offer evidence: (1) "that would 'cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and (2) "show 'gender bias was a motivating factor'" *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 91 (1st Cir. 2018)

13

(quoting *Yusuf*, 35 F.3d at 715).  To show a causal connection between the alleged gender bias and outcome of the disciplinary proceedings, Plaintiff "cannot merely rest on superficial assertions of discrimination, but must establish that 'particular circumstances suggest[] that gender bias was a motivating factor.'"  *Id.* (quoting *Yusuf*, 35 F.3d at 715).  This requirement can be met by pointing to "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that . . . show the influence of gender."  *Yusuf*, 35 F.3d at 715.

**B.    A Reasonable Jury Could Not Find That DU Was Motivated by Gender Bias.**

**1.    DU is Not Responsible for the Gender Makeup of Students Who Are Accused By Other Students of Sexual Misconduct.**

As the District Court correctly concluded, DU has no control over the gender makeup of students who accuse other students of sexual misconduct.  Thus, John's arguments concerning the gender makeup of complainants versus respondents cannot be used to impute gender bias to DU.  (Aplt. App. at A1474-1475.)

**a)    The District Court Properly Characterized John's Case.**

In arguing that the District Court erred in ruling against him on this point, John first argues that the District Court mischaracterized his case by stating that "'much' of the evidence of differential treatment relates to" the reality that sexual misconduct cases are often brought by female complainants against male

respondents.  John's Brief, at 21-22.  John contends that his evidence of gender bias instead goes to a "gender biased process" and "focuses more on" the allegedly biased training of Title IX administrators, the investigation by DU, the sanctioning of John and the disparate resources allegedly provided to female complainants and male respondents.  John's Brief, at 21-22.  John, however, does not—and cannot—argue that the District Court failed to consider his additional arguments of biased training, biased investigators, disparate resources, or a biased investigation.  To the contrary, the Court analyzed and rejected each one of these argument in its nine pages of analysis of John's Title IX claim.  (Aplt. App. at A1471-1479.)

**b)**     **The Proportion of Female Complainants/Male Respondents Does Not Create an Inference of Gender Bias.**

John next quibbles with the District Court's statement that the "majority" of complainants of sexual misconduct at DU are female and the majority of respondents are male.  John calls this an "understatement," pointing specifically to the fact that 34 out of 35 complaints of sexual misconduct filed with DU from 2011 through 2016 were filed by women against men.  John's Brief at 22.  The District Court, however, explicitly referenced this gender breakdown of complainants and respondents at DU that John points to.  (Aplt. App. at A1474) (citing the gender makeup of the 35 complaints of sexual assault at DU from 2011 to 2016).   Thus, while the District Court may have referred (albeit correctly) to this imbalance in numbers as a

"majority" of complainants being female and respondents being male, the Court's Order makes clear that it understood the exact gender breakdown of Title IX complaints at DU.

Further, the District Court's well-reasoned rationale for rejecting John's argument applies regardless of whether it "misstated" the exact numbers (which it did not). The Court's ruling was that DU has no control over the gender makeup of students who accuse other students of sexual misconduct, and that no gender bias can accordingly be inferred from the proportion of male and female complainants and respondents. (Aplt. App. at A1474-1475.) Numerous other courts have concluded the same. *E.g.*, *Doe v. Purdue Univ.*, 281 F. Supp. 3d 754, 781 (N.D. Ind. 2017) ("Purdue 'is not responsible for the gender makeup of those who are accused by other students of sexual misconduct.'") (citation omitted); *Doe v. Univ. of Colorado*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017) (same); *Doe v. Regents of the Univ. of California,* 2016 WL 5515711, at \*5 (C.D. Cal. July 25, 2016) (same); *see also Doe v. Cummins*, 662 Fed. App'x 437, 453-54 (6th Cir. 2016) (finding no gender bias from the fact that only males were accused of sexual misconduct because campus only received complaints against males).

John states that *Doe v. Univ. of Colorado*, 255 F. Supp. 3d at 1078, and *King v. DePauw University*, 2014 WL 4197507, at \*10 (S.D. Ind. Aug. 22, 2014), which the District Court cited in support of its conclusion, were "not well formulated and

miss the point," but he offers no support or explanation for this argument. John's Brief, at 24. These two cases are well-reasoned and firmly in line with caselaw from around the country. *E.g.*, *Doe v. Purdue Univ.*, 281 F. Supp. 3d at 781; *Doe v. Regents of the Univ. of California,* 2016 WL 5515711, at \*5; *see also Doe v. Cummins*, 662 Fed. App'x at 453-54.

In addition, John's attempt to infer bias simply from the proportion of male vs. female respondents represents a disparate impact theory, which is not cognizable under Title IX. *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (holding that a private right of action under Title VI is limited to intentional discrimination and noting that Title IX is patterned on Title VI); *see also Doe v. Columbia Coll. Chi*., 299 F. Supp. 3d 939, 950 (N.D. Ill. 2017) (noting that "Title IX does not . . . create a private right of action for disparate impact cases").

### c) Compliance with the April 2011 Dear Colleague Letter Does Not Raise an Inference of Discrimination.

John next argues that the District Court erred in rejecting his argument because the disproportionate number of female complainants and male respondents was "something to have been expected from implementing the April 2011 Dear Colleague Letter." John's Brief, at 23. John's argument is essentially that because the Dear Colleague Letter made reference to statistics on sexual assault against women on campus, any procedures that DU set up to comply with the Dear

17

Colleague Letter must necessarily be motivated by gender bias.  *See* John's Brief, at 23-24.  In essence, John's theory would hold any university liable under Title IX simply because it set up sexual misconduct procedures following the Dear Colleague Letter.

John also argues that, in establishing Title IX procedures as a result of "coerc[ion]" by the federal government, universities were "not unaware" "that in almost all cases, females would be complainants and males would be respondents," which he claims translates into gender discrimination.  John's Brief, at 23-24.  This argument is meritless.  John essentially seeks to hold all universities liable under Title IX by virtue of a general awareness that more males than females are accused of engaging in non-consensual sexual contact.  A showing that a particular university was motivated by gender bias requires more.  *E.g.*, *Doe v. Univ. of Colo.*, 255 F. Supp. 3d at 1078 ("[P]ressure from the federal government to investigate sexual assault allegations more aggressively . . . says nothing about the University's alleged desire to find men responsible because they are men."); *see also Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214, 1226 (D. Or. 2016) (finding that bias against perpetrators of sexual misconduct "does not implicate gender discrimination simply because those alleged perpetrators are typically male.").

John next argues about procedures that he claims, without any support, are "victim-centered" and that "unfairly favor" complainants and disfavor respondents.

John's Brief, at 24-25. A bias in favor of a *complainant* of sexual misconduct, however, does not equate to a bias against *males*. (Aplt. App. at A1475); *e.g., Doe v. Cummins*, 662 Fed. App'x at 453 (affirming dismissal of Title IX claim, finding that deficiencies showing bias in favor of sexual assault complainants "does not equate to gender bias because sexual-assault victims can be both male and female"); *Doe v. Univ. of Colorado*, 255 F. Supp. 3d at 1079 (same); *Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214, 1226 (D. Or. 2016) (same).[2]

## 2. DU's Purported Encouragement of Sexual Misconduct Reporting Does Not Equate to Bias Against Males.

The District Court correctly rejected John's argument that DU's purported encouragement of sexual misconduct reporting shows gender bias. (Aplt. App. at A1474-A1475.) John's entire argument of DU's discriminatory encouragement hinges on an alleged poster with the message "[i]f you regret it, it was rape," and he has offered only his own vague deposition testimony to support his argument that such a poster even existed. John's Brief, at 26-28; (Aplt. App. at A1508) (John

---

[2] John's related argument referencing *Doe v. Miami*, 882 F.3d 579, 594 (6th Cir. 2018), is similarly unavailing. He argues that one reason the court held "the university liable under Title IX" was that reduced protections for the accused meant that male respondents are sanctioned. John's Brief, at 24-25. However, the court in *Miami* never found the university liable; the question on appeal was not liability, but whether the plaintiff's allegations met the low pleading standard of plausibility. *Id.* at 594. Equally notable is that there is no mention of reduced protections for the accused in the case.

stating, "If I recall correctly, I believe I saw a poster that said if you regret it, it was rape."). Assuming, for the sake of argument, that the poster did exist and was approved by DU (notwithstanding the absence of any such evidence in the record), the message it presented is entirely gender neutral and fails to support an inference of gender bias. (Aplt. App. at A1474-A1475.)

### a) An Alleged Poster Stating "If You Regret It, It Was Rape" Does Not Demonstrate Gender Bias.

The District Court properly concluded that, even assuming John correctly remembered seeing a poster at DU stating "[i]f you regret it, it was rape," such a poster simply does not give rise to an inference of gender-biased encouragement. (Aplt. App. at A1474-A1475) ("[I]t is not clear to the Court how such a poster would give rise to an inference of gender bias."). Both men and women are equally capable of regretting sexual contact, so such a poster—even if it existed—fails to show that DU was encouraging the filing of complaints against men. *Id.* Citing *Doe v. Columbia College Chicago*, 299 F. Supp. 3d at 955, the District Court further noted that a University's encouragement of sexual misconduct reporting is not inherently discriminatory as these policies are "not gender-biased and instead are legitimate preventative education programs and resources that OCR has explicitly instructed universities to provide for survivors and victims of all genders." (Aplt. App. at A1475.)

On appeal, John argues that the manner in which DU allegedly encouraged sexual misconduct reporting—through the alleged poster—distinguishes DU's policies from those deemed proper in *Doe v. Columbia College Chicago*. John's Brief, at 26. John cites *Doe v. Washington & Lee Univ.*, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015), which also discusses a statement of regret equaling rape. John's Brief, at 26. That case, however, addresses only whether Plaintiff had pled sufficient facts to survive a motion to dismiss. *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *9-10. Further, the statements of regret equaling rape were made by the University's Title IX Officer who ran the Title IX investigation at issue, and the Officer discussed regret equating to rape explicitly in the context of females expressing regret and males committing rape. *Id.* at *3-8, *10. In the present case, John has alleged no facts indicating that DU's purported encouragement of sexual misconduct reporting through the alleged poster was inescapably, or in any way, tied to gender.

In sum, John failed to present any evidence that DU encouraged the reporting of sexual misconduct against males. The District Court was thus not required to make unreasonable and unsupported inferences in his favor in ruling on summary judgment. *Llewellyn,* 711 F.3d at 1187; *Baca*, 398 F.3d at 1216.

**b)      John's Argument that Males Are Disproportionally Impacted is a Non-Cognizable Disparate Impact Theory.**

John also argues that DU's alleged encouragement of sexual misconduct reporting leads to more males being accused.  John's Brief, at 27.  He states that the mere fact that some males are found not responsible does not "negate evidence of gender bias in encouragement of sexual misconduct reporting of the type done at DU." *Id.*  First, John has made no showing of any gender-biased encouragement. (*See* Aplt. App. at A1475.)  Further, in arguing that men are *disproportionately* accused despite the undeniable fact that some males at DU have been found not responsible for sexual misconduct, John is simply advancing a non-cognizable disparate impact theory under Title IX.  John's Brief at 27; *see Alexander,* 532 U.S. at 280; *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d at 950.

**3.      John is Unable to Establish An Inference of Gender Bias from DU's Training Materials.**

As the District Court correctly determined, at most, John's evidence with respect to training at DU shows bias in favor of sexual misconduct complainants.  Such evidence does not translate into gender bias.  (Aplt. App. at A1475.)

**a)      The District Court Properly Considered and Rejected John's Evidence Under the Totality of the Circumstances.**

John argues that the District Court "considered the subject of training materials in a vacuum rather than in conjunction with the totality of the circumstances."  John's Brief, at 28. However, John overlooks the fact that the

District Court expressly noted that it was "[c]onsidering plaintiff's evidence as a whole" and found "that it does not demonstrate a genuine issue of fact as to whether sexual bias was a motivating factor behind DU's decision to discipline plaintiff." (Aplt. App. at A1474.)   Clearly, its ruling on training materials was that John's evidence, on its own, does not raise an inference of gender bias, and that, in looking at the totality of the evidence, the Court found no such inference anywhere.  (*See* Aplt. App. at A1474, A1475.)

### b)    The Record on Training Demonstrates There Was No Gender Bias in DU's Training Materials.

On appeal, John argues that the District Court ignored the record on training. John's Brief at 28-29.  John first points to purported flaws in trainings described by Eric Butler and Kristin Olson and ways in which the Gruber Report shows this training was biased.   John's Brief at 28-29 (pointing to, *inter alia*, the Gruber Report's discussion of trainings depicting campus rapes as frequent and unreported, instructing attendees that inconsistent complainant testimony is due to trauma and evidence that complainant is telling the truth, and allegedly instructing DU employees to see sexual assault as what boys do to girls).[3]  John never argued any of these purported flaws in his summary judgment briefing.  (Aplt. App. at A319)

---

[3] Instead of relying on the actual language of the training materials, John resorts to the slanted paraphrasing and characterizations of his expert witness.

(presenting only the argument discussed below regarding the training titled "Understanding Title IX and Responding to Survivors"). These arguments are thus waived on appeal. *Tele–Communications, Inc.*, 104 F.3d at 1232-33; *Anschutz,* 820 F.2d at 344 n.5.

John did present an argument below of bias relating to a specific training titled "Understanding Title IX and Responding to Survivors." (Aplt. App. at A319.) The District Court rejected this argument for good reason. (Aplt. App. at A1475.) John's sole argument is that the training contained language on empowering "the survivor" and communicating empathy and belief to "the survivor." John's Brief, at 29. He argues that "this statement constitutes a university directive to bias investigations in favor of females by presuming their accounts to be true and that they are victims who have survived sexual assault." John's Brief at 29. John, however, is unable to bridge the inferential gap between bias in favor of "survivors" and bias in favor of females and against males. The term "survivor" applies equally to males and females. *See, e.g.*, *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d at 955–56 ("[I]f anything, the use of the word "victim" in CCC's policy manual . . . creates a bias in favor of those who complain of sexual assault, not in favor of females specifically."); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 606-07 (S.D. Ohio 2016) (same); *Bleiler v. Coll. Of the Holy Cross*, 2013 WL 4714340, at *12 (D. Mass. Aug. 26, 2013) (same). John's argument thus, again, erroneously and without any support

attempts to equate alleged bias in favor of complainants or survivors of sexual misconduct with bias in favor of females and against males.  (*See* Aplt. App. at A1475); *e.g.*, *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d at 955-56 (concluding that bias in favor of complainants or against respondents does not show gender bias); *Bleiler*, 2013 WL 4714340, at *12 (same).

The District Court also properly rejected John's arguments regarding Jean McAllister, noting that "[b]ecause there is no indication that Ms. McAllister had any influence on the investigation, her 'biases' are insufficient to create a genuine issue of fact."  (Aplt. App. at A1476-1477.)  That McAllister was not involved in any aspect of the investigation is not controverted.  But even if she had been involved, McAllister's language of "victim" and "survivor" is not indicative of gender bias. *E.g.*, *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d at 955–56.

### c)     The Cases Cited by the District Court Were Directly On Point

John argues that the District Court relied on three "inapposite, misread, or mistaken" cases in rejecting his argument that DU's training materials were gender biased.  John's Brief at 30-31.  These cases, however, are well-reasoned and squarely on point.

In *Bleiler,* 2013 WL 4714340, the court rejected a nearly identical argument that training materials that "refer[red] to a reporting complainant as a 'victim,' as

opposed to a 'reporter' or a 'complainant' thereby assum[ed] the guilt of the accused." *Id.* at *12. The Court found that "[Plaintiff's] claim of bias is that the bias is 'toward the rights of reporting complainants,' which is not the same as alleging bias or discrimination against male students as required for his Title IX claim." *Id.* While John argues that the training at DU instructed investigators to "communicate that you believe the survivor," the fundamental flaw recognized by both the District Court and the court in *Bleiler* holds: bias in favor of complainants does not mean gender bias against males. *Id.*; (Aplt. App. at A1475.)

In *Doe v. Columbia Univ.*, 831 F.3d 46, 57-58 (2d Cir. 2016), plaintiff's allegations that gender bias was shown by university officials favoring the complainant's version of events were held to be insufficient to survive a motion to dismiss. *Id.* The court noted that "[w]hile those allegations "support the inference of bias, they do not necessarily relate to bias on account of sex." *Id.* at 57. Instead, in order to find any inference of bias, the court had to look to entirely different allegations, namely the university administration's awareness of "substantial criticism of the university, both in the student body and in the public media, accusing the university of not taking seriously complaints of female students alleging sexual assault by male students." *Id.* at 57. No such inference of gender bias exists here.

Finally, the Court cited *Doe v. Univ. of Colorado*, 255 F. Supp. 3d at 1079, which credits the university's argument that pro-victim bias does not equate to

gender bias, consistent with the conclusions reached by multiple other courts. *Id.* at 1079; *e.g.*, *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d at 955; *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015); *Bleiler*, *2013* WL 4714340, at *12. John disagrees with the holding and argues that the case was wrongly decided, but offers no contrary caselaw in support of this point. John's Brief, at 31. While John argues that he should not be limited to a showing that similarly-situated women were treated more favorably, he points to no other evidence that creates an inference of anti-male bias. Finally, the amended complaint in *Doe v. University of Colorado*, which John argues was later upheld against a motion to dismiss, actually dropped the Title IX claim and pled only a Procedural Due Process claim. Second Amended Complaint, *Doe v. DiStefano*, 2017 WL 6210551, ¶¶ 92-106 (D. Colo.).

### 4.     The Resources DU Provided to Complainants and Respondents Do Not Show Gender Bias.

The District Court correctly concluded that John was unable to raise any inference of gender bias with respect to the resources DU provided to complainants and respondents. (Aplt. App. at A1476.)

John suggests that all resources provided by DU were complainant-specific. John's Brief at 32.    This is false. Jane and John received an identical list of resources, (*see* Aplt. App. at A1476; Aplt. App. at A259-A262), which included resources equally available to complainants and respondents, such as the University

of Denver Health and Counseling Center and the University Chaplain. (Aplt. App. at A259-A262.) That John can show one resource on that list, the Center for Advocacy and Prevention and Empowerment ("CAPE"), was complainant-specific "does not support an inference of gender bias." (Aplt. App. at A1476) (noting in addition that John "cites no evidence that CAPE offered support to female respondents"); *Yu v. Vassar College*, 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015).

In *Yu*, 97 F. Supp. 3d at 480, which the District Court cited, the court rejected a claim of gender bias based on the fact that the complainant, but not the respondent, received counseling services. *Id.* "That an alleged victim of sexual misconduct would receive help from a counselor cannot reasonably be seen as a marker of anti-male gender bias." *Id.* The provision of a resource to the complainant, the court found, shows at most bias in favor of complainants, not bias against males. *See id.* John describes *Yu* as an "outlier" but is unable to point to a single decision holding that the provision of a few complainant-specific resources is indicative of gender bias, particularly where, as here, resources were made available to both respondent and complainant. John's Brief, at 32-33, 45-46; (Aplt. App. at A259-A262.)

### 5.    The Investigators Were Not Biased Against John Because He Is Male.

John points to his own "'consistent story' of consensual sexual intercourse" and argues that gender bias is shown because the Investigators ultimately found him

28

responsible despite his version of the events.[4]  John's Brief, at 33-35.  In his summary judgment opposition, John argued that the Investigators "failed to consider" the facts he now points to. (Aplt. App. at A321-322.)  The District Court explained that the facts John referenced were largely taken directly from the investigation report, which "bel[ies] any assertion that the facts were not 'considered' in the course of the investigation."  (Aplt. App. at A1477.)  As the District Court correctly concluded: "that the investigators ultimately found Ms. Doe's story to be more credible does not demonstrate that they 'failed to consider' exculpatory information."  (Aplt. App. at A1477-1478.)

John contends that the Investigators demonstrated bias by finding him in violation of DU's policy despite his version of events.  John's Brief, at 33-35.  In making this argument, John presents only the facts in his favor and ignores the conflicting and unfavorable evidence against him.  Indeed, several of his "facts" are directly lifted from his own self-serving statement to the Investigators.  John's Brief at 5, 33 (citing A232, John's summary statement given to the Investigators, as the sole support for the alleged fact that Jane initiated sexual contact and that they "spooned" at her request).  That the Investigators drew different conclusions from

---

[4] While John faults the Investigators for purportedly conducting a flawed and biased investigation, his Appellant's Brief portrays his sole rendition of the facts as pure gospel truth—an antithesis to fair and impartial investigations.

the evidence than John would in his own biased view of the facts does not show gender bias.

As the District Court found, the investigative report makes clear that the Investigators considered each fact that John pointed to in claiming there was an error. (Aplt. App. at A1477). "Unbiased persons can weigh the same evidence differently," and John's mere disagreement with the determinations made after considering all of the evidence, including the facts he points to here, does not demonstrate the requisite gender bias. *Doe v. Purdue Univ.,* 281 F. Supp. 3d at 778 ("Plaintiff must allege more than disagreement with how accurately [the decisionmaker] weighed the evidence."); *Yu*, 97 F. Supp. 3d at 462, 477 ("That Yu disagrees with the [disciplinary panel's] consideration of the evidence is not grounds for the Court to find the [panel]'s decision to be in violation of the law.").

### a)    *Doe v. Columbia* **Does Not Advance John's Arguments.**

Arguing that the District Court erred, John cites *Doe v. Columbia Univ.*, 831 F.3d at 57-58, which was decided on a motion to dismiss. There, the court held that "[w]hen the evidence substantially favors one party's version of a disputed matter but an evaluator forms a conclusion in favor of the other side (without an apparent reason based on the evidence), it is plausible to infer . . . that the evaluator has been influenced by bias." *Id.* at 57. Notably, John provides no support for his bare assertion that the evidence in this case was in fact "heavily in support of [his]

account," and as described above, several "facts" he points to are supported only by his own slanted version of the events. *See* John's Brief, at 33-34. He wholly ignores the fact that there was conflicting evidence and facts that weighed against him.

Even if John could show that the evidence was heavily in his favor, the court in *Columbia* explained that the inference of bias that stems from an outcome starkly in conflict with the evidence is not necessarily even one of gender bias. *Doe v. Columbia Univ.*, 831 F.3d at 57-58. Indeed, even at the motion to dismiss stage, the court there had to look to other evidence to find "plausible support to a bias with respect to sex." *Id.* In other words, it is not enough to merely contend that the investigators got it wrong or that the investigation was flawed. The additional allegation in *Columbia* needed to meet the "low standard" to survive a motion to dismiss was the substantial public criticism that the university was not taking female students' complaints of sexual assault seriously. *Id.* at 48, 57. Here, as the District Court correctly found, John's other arguments, even when considered as a whole, fail to raise an inference of gender bias. (Aplt. App. at A1474-A1479.)

### b) The Gruber Report's Discussion of Alleged Investigative Flaws Does Not Raise an Inference of Gender Bias.

John alleges that there were nine investigative flaws benefitting the Complainant which were discussed in the Gruber Report and which he claims demonstrate gender bias against males. John's Brief at 35. John argued only two of

these alleged investigative flaws to the District Court, and he did so only to support his state-law breach of contract claim.   (Aplt. App. at A307, A326, A328.) Specifically, John argued that Eric Butler misunderstood the preponderance standard, and that the Investigators disregarded inconsistencies in Jane Doe's story—in breach of DU's policies guaranteeing a "thorough, impartial and fair investigation." (Aplt. App. at A307, A325, A326, A328.)   As the District Court properly found, these two alleged investigative flaws (which were argued only in support of John's breach of contract claim) were "not material to the Court's conclusions" as to whether gender bias was a motivating factor behind plaintiff's discipline for purposes of his Title IX claim." (Aplt. App. at A1481.)  At most, the two alleged flaws would show bias in favor of complainants, not gender bias.  *See id.*  Even John acknowledges as much in making this argument.  John's Brief, at 35 (stating the Gruber Report shows that "[n]early all the investigative deficiencies . . . benefit Complainant").

Even ignoring the fact that John never raised the remaining alleged investigative flaws in his summary judgment briefing, *see Tele–Communications, Inc.*, 104 F.3d at 1232-33; *Anschutz Land,* 820 F.2d at 344 n.5, they suffer from the same defect as the two the District Court did consider: they show, at most, bias in favor of complainants and fail to link that bias in any way with bias against males.

John's Brief at 35.   Not one of the nine investigative flaws John alleges even addresses gender.  *See* John's Brief at 35.

### 6.    John's Expulsion Does Not Raise an Inference of Gender Bias.

John argues that his expulsion was so severe a sanction that it alone shows that the University was biased against males.  John's Brief at 35-36.  The District Court properly rejected this argument, noting that even John admitted that "[a]ll DU cases involving penetration have resulted in expulsion" and that John failed to show that he was singled out for such a sanction on the basis of gender.  (Aplt. App. at A1478.)

In making discipline decisions, the Outcome Council weighs a number of factors, including the nature and severity of the act, complainant and community safety, prior conduct history of the respondent, and the effect of the act on the Complainant.  (Aplt. App. at A153.)   The fact that expulsion is generally imposed after the Outcome Council weighs these factors in cases of non-consensual sexual penetration reflects the seriousness of that type of misconduct and the harm it causes, not "a gender biased belief that males need to be sanctioned severely for sexual misconduct," as John claims, John's Brief, at 36.  *E.g.*, (Aplee. Supp. App. at A1740); (noting that in cases involving non-consensual penetration, a "threat to campus is there, that they may re-offend.").

Further, John offers no evidence to support his allegation that the Outcome Council failed to consider these factors or that they, as he claims, "simply ignored" DU's policies.    John's Brief, at 37.   Instead, his argument reflects his mere disagreement with the Outcome Council's decision and his belief that the few factors that weigh in his favor mean he should have received a lighter penalty than expulsion despite the numerous other factors weighing against him.  *See id.*  While John clearly would weigh the factors differently, this in no way establishes that the Outcome Council was motivated by anti-male bias in reaching its decision.  *See Yu*, 97 F. Supp. 3d at 477; *Doe v. Purdue Univ.,* 281 F. Supp. 3d at 778 ("[U]nbiased persons can weigh the same evidence differently.").

John has further testified that he had no reason to think members of the Outcome Council were biased against him. (Aplt. App. at A1503-A1504.)  His appeal of the Outcome Council's decision did not include any allegations that Council members were biased.  (Aplt. App. at A165-A167.)

### a)    The District Court Did Not Require John to Show Female Respondents for Comparison.

John suggests that the District Court *required* him to show that female respondents received less severe sanctions for similar misconduct in order to find that he established the requisite gender bias.  John's Brief, at 37-38.  This is simply false.  The District Court made clear that John could have shown gender bias in

34

several ways, including "evidence that women have received lesser sanctions for similar conduct, statements by university officials indicating the impact of gender on the severity of the penalties imposed, or 'patterns of decision-making . . . tend[ing] to show the influence of gender." (Aplt. App. at A1478-1479.) As the District Court properly concluded, John failed to put forth credible evidence of gender bias in any form.

### 7. Even Under the Totality of the Circumstances, John Failed to Show Gender Bias.

John puts forth a one-sentence argument on this point, alleging that the District Court erred in granting summary judgment because the totality of the evidence shows that gender bias was a motivating factor in the decision to expel John. John's Brief at 38. As noted above, the District Court properly considered John's evidence "as a whole," and determined that John presented no credible evidence to show that gender bias was a motivating factor in DU's decision to expel him. (Aplt. App. at A1474-1479.)

### C. John Waived Arguments of Gender Bias Under the Gruber Report, and Gruber's Fitness as an Expert is Not at Issue on Appeal.

### 1. Waiver

The District Court correctly determined that it did not need to rule on DU's Motion to Exclude Gruber's expert testimony because John presented arguments under the Report only to support his state-law breach of contract claim and not to

support his claim of gender bias under Title IX.  (Aplt. App. at A1481) ("[P]laintiff does not rely on the expert opinion[] of . . . Aya Gruber . . . to support his due process and Title IX causes of action.").

John's three arguments under the Gruber Report in his Opposition to DU's Motion for Summary Judgment were all in support of his breach of contract claim, where he argued that DU breached a contract with him by failing to conduct a thorough, impartial, and fair investigation.  (Aplt. App. at A325-A327.)  Two of his three references to the Report were explicitly in the brief's breach of contract section, and the third was to a fact in the Statement of Undisputed Facts, which John later referenced only in the breach of contract section.  (Aplt. App. at A307, A326, A327, A328) (discussing the Investigators' failure to consider the potential for Complainant to change facts in the time between the sexual misconduct and her report, their "one-sided credibility assessment," and Eric Butler's alleged misunderstanding of the preponderance standard).

On appeal, John now points, for the first time, to the Gruber Report's discussion of gender bias and of, *inter alia*, "the gendered nature of rape law and policy," "the history of 'rape myths' and how gendered and feminist views of rape have impacted Title IX investigations on college campuses," and "bias in DU's process that correlates with gendered, victim-centric views of how to approach sexual assault cases."  John's Brief, 38-39.  These new arguments under Gruber's

Report were never presented to the District Court and reflect John's effort on appeal to get a second bite at the apple. *Tele–Communications, Inc.*, 104 F.3d at 1232-33; *Anschutz,* 820 F.2d at 344 n.5.

### 2.    There is No Issue on Appeal Regarding the Admissibility of Gruber's Testimony.

John argues that DU's Motion to Exclude Gruber's expert testimony "should have been denied."  John's Opposition Brief, at 38.  This argument suffers from several flaws.  First, John did not appeal the District Court's decision not to rule on the admissibility of Gruber as an expert.  John's Brief, at 3.  Second, there is no decision on the merits regarding the admissibility of Gruber's opinions for this Court to review.

Finally, even if the District Court had ruled on the motion and excluded Gruber, this exclusion would have no impact on John's Title IX arguments on appeal.  In his summary judgment briefing, John never presented arguments under the Gruber Report to support his Title IX claim, and he accordingly cannot use the Report on appeal to bolster his Title IX claim with evidence and arguments never presented below.  (Aplt. App. at A307, A326, A327, A328.)[5]

---

[5] Because Gruber's admissibility as an expert is not relevant to this appeal, DU will not address the merits of those arguments here.  For a substantive response to John's arguments on Gruber's fitness as an expert, DU refers to its Motion to Exclude Expert Testimony and its Reply in support of that motion.  (Aplt. App. at A651-A759; A1444-A1452.)

Even if his arguments were not waived, expert reports are not a substitute for John putting forth credible factual evidence on the issue of gender bias. *See United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008). Further, the unsworn report of a disputed expert is not even competent summary judgment evidence. *Smith v. Palafox*, 728 F. App'x 270, 275–76 (5th Cir. 2018); *Peak ex rel. Peak v. Cent. Tank Coatings, Inc*., 606 F. App'x 891, 895 (10th Cir. 2015).

**D.     The District Court's Ruling on Discretion Was Proper.**

John's final argument is that the District Court improperly concluded that universities have leeway in determining how to address misconduct that occurs on their campuses. John's Brief, at 44. John claims that "[d]eference is misapplied here to water down DU's obligation to comply with federal law such as Title IX." *Id.* Even a cursory reading of the District Court's opinion shows this is incorrect. The District Court first evaluated all of John's evidence and concluded that it amounted to mere "disagreement" with DU's Title IX procedures, rather than gender bias that would be actionable under Title IX. (Aplt. App. at A1479.) Only after ruling out a Title IX violation did the District Court note that DU has deference to address misconduct on campus. *Id.* John is unable to point to any part of the District Court's Order where the Court held that universities have unfettered discretion to address sexual misconduct cases *regardless* of the dictates of Title IX.

38

John next attempts to distinguish *Yu*, which the District Court cited in ruling on this point. (Aplt. App. at A1479.) John, again with no explanation, refers to the decision in *Yu* as an "outlier." John's Brief, at 45-46. He offers only his own self-serving disagreement and a citation to the non-authoritative musings of a controversial commentator. John's Brief, at 45-46. John further argues that *Yu* was "*sub silentio* overruled by *Doe v. Columbia*, 831 F.3d 46." *Id.* at 45. This is simply incorrect. First, the two cases were decided at entirely different procedural postures, with *Columbia* being decided on a motion to dismiss and *Yu* on a motion for summary judgment. *Columbia*, 831 F.3d at 48; *Yu*, 97 F. Supp. 3d at 452. Further, the Court in *Columbia* never even mentioned university discretion to address misconduct occurring on their campuses.

## III.

## THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON JOHN'S CONSTITUTIONAL DUE PROCESS CLAIM.

John alleges that DU, a private university, is a state actor which denied him Due Process in expelling him for violating DU's sexual misconduct policies without providing him with notice and a hearing. John's Brief, at 46-47, 54-55. John, however, is unable to cite to a single case where a court has found that a private university is a state actor under the theories he advances; indeed, all cases that have

considered similar theories and arguments have uniformly rejected them. The District Court's grant of summary judgment on his claim was proper.

## A.    The Law Governing When Private Parties Are State Actors for Due Process Purposes.

Generally, the United States Constitution regulates only governmental activity. *See, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). But when a private actor's conduct is "fairly attributable" to the government, the private entity may be considered a state actor and constitutional protections may apply. *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982). The Supreme Court has found that private institutions may be considered governmental actors when: (1) the private entity has been delegated a public function traditionally exclusively reserved to the State, *West v. Atkins*, 487 U.S. 42, 56 (1988); *Blum*, 457 U.S. at 1005; (2) the State provides significant encouragement as to the result complained of, *Blum*, 457 U.S. at 1004; (3) the challenged activity results from the State's exercise of coercive power, *id.*; or (4) the private entity is "entwined with governmental policies," *Brentwood Acad. v. Tenn. Secondary School Athletic Ass'n*, 531 U.S. 288, 295 (2001). "[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement . . . that *the choice must in law be deemed to be that of the State*." *Blum*, 457 U.S. at 1004 (emphasis added).

40

**B.    DU Was Not Delegated a Public Function Traditionally Exclusively Reserved to the State.**

**1.    John Waived His Delegation Argument.**

In his summary judgment briefing, John argued only that DU was coerced by or entwined with the *federal government*.  (Aplt. App. at A1462; A311-A314.) On appeal, however, John now argues that DU was a state actor by virtue of being delegated the *State's* traditional public function of "adjudicating rape and sex crimes."  John's Brief, at 49-50, 53-54.  He has waived this argument on appeal. *Tele–Communications, Inc.*, 104 F.3d at 1232-33; *Anschutz Land,* 820 F.2d at 344 n.5.  Nevertheless, his argument fails on the merits for the reasons detailed below.

**2.    Prosecution is Not a Public Function Traditionally Reserved to the State Exclusively.**

A delegation theory is viable only where the delegated duty is one that has been traditionally exclusively reserved to the State.  *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974).  The delegation test is narrow and "difficult to satisfy" because "[w]hile many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'"  *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1456 (10th Cir. 1995) (citation omitted); *e.g.*, *Jackson*, 419 U.S. at 352-53.  The Supreme Court has held that only a few narrow activities fall into this category, including administrating elections of public

officials, the operation of a company town, and the management of a city park. *Jackson*, 419 U.S. at 352-53.

Criminal prosecutions have not been traditionally exclusively reserved to the State and accordingly cannot be used to support a state action argument. *Rochez v. Mittleton*, 839 F. Supp. 1075, 1081 (S.D.N.Y. 1993) (finding no state action where a court officer initiated a private criminal prosecution of the plaintiff because prosecution is not "the exclusive prerogative of the state."). "Private prosecutors, while certainly not the norm, have been used in a variety of settings and jurisdictions in this country." *Id.*; *see also* Roger A. Fairfax, Jr., *Delegation of the Criminal Prosecution Function*, 43 U.C. Davis L. Rev. 411, 413-15 (2009) ("Up until the late nineteenth century . . . private lawyers regularly prosecuted criminal cases on behalf of both crime victims and the state."). Because prosecution has not been traditionally the exclusive prerogative of the State, there can be no state action under a delegation theory. *Rochez*, 839 F. Supp. at 1081.

### 3. There Has Been No Delegation of the State's Prosecutorial Function to DU.

Further, the State of Colorado's authority for adjudicating rape and sex crimes has not in fact been delegated to DU through the April 2011 Dear Colleague Letter, or by any other means. In deciding Title IX complaints, DU is not in fact adjudicating, as John claims, the crimes of rape or criminal sexual offenses of any

kind.  John's Brief, at 49-50.  DU's Title IX investigations solely evaluate whether there was a violation of campus policy.  (*E.g.*, Aplt. App. at A149) (noting that Title IX investigations determine violations of campus policy).  Indeed, the University's Title IX procedures refer to sexual misconduct under terms and definitions created by the University, not the criminal law or any other state statute, and the most severe consequence that can be imposed from a finding of responsibility is expulsion—not loss of liberty as in a criminal prosecution.  (Aplt. App. at A140-A141) (defining the policy violations of "non-consensual sexual contact" and "sexual exploitation"); (Aplt. App. at A154-A155) (detailing potential sanctions).

As further evidence that there has been no delegation, a Title IX investigation in no way relieves the State of or usurps its power and authority to prosecute the same conduct criminally.  *E.g.*, April 2011 Dear Colleague Letter at 9-10, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf  ("[T]he same conduct may constitute both sexual harassment under Title IX and criminal activity. . . . [B]ecause the standards for criminal investigations are different, police investigations or reports are not determinative of whether sexual harassment or violence violates Title IX. . . ."); *see also Doe v. The Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 590 n.16 (E.D. Va. 2016).  Title IX is simply an additional "remedy Congress has deemed appropriate to make available despite

43

knowing full well that state civil and criminal remedies exist." *Doe v. The Rector*, 179 F. Supp. 3d at 590 n.16.

**4.     John's Additional State Action Arguments Fail.**

      **a)     Actions by the Federal Government Are Irrelevant to John's Fourteenth Amendment Claim.**

As the District Court correctly notes, John brought only a Fourteenth Amendment, rather than a Fifth Amendment, claim. (Aplt. App. at A1462.)   John's arguments to the District Court, however, were exclusively related to "DU's entwinement with the federal government." *Id.*   The District Court stated that "it is not clear why DU's receipt of *federal* funding and compliance with [federal] Title IX standards is relevant to plaintiff's Fourteenth Amendment claim." *Id.* (emphasis added).  While it ultimately disposed of John's Due Process claim on other grounds, the District Court cited language from this Court's decision in *Browns v. Mitchell* that: "[i]nasmuch as . . . 42 U.S.C. §1983 [] is concerned only with state action and does not concern itself with federal action we lay to one side as entirely irrelevant any evidence concerning the participation of the federal government in the affairs of the University."  (Aplt. App. at A1462) (quoting *Browns v. Mitchell*, 409 F.2d 593, 595 (10th Cir. 1969)).

John ineffectively attempts to distinguish *Browns,* stating that this language was said "in passing in a much different context."   John's Brief at 53-54.  The Court's language, however, is squarely on point.  *Browns*, 409 F.2d at 595; *see also*

*Rendell-Baker*, 457 U.S. at 838 (noting that §1983's "under color of state law" and the Fourteenth Amendment's "state actor" inquiries present essentially the same question). While John's additional efforts to distinguish *Browns* are not entirely clear, to the extent he argues that the April 2011 Dear Colleague Letter represented the federal government delegating to private universities the State's power to adjudicate sex offenses, this fails for several reasons. First, as discussed above, John waived any argument under a delegation theory (and the argument is also meritless). Additionally, John provides no support for this argument whatsoever and fails even to establish that the federal government would have the authority to give away the State's power to prosecute crimes. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535–36, (2012) (discussing federalism principles and noting that States possess the "police power" and that it is within their province to punish crimes).

> **b)     The Receipt of Federal Funds and the Risk of Defunding Do Not Establish State Action.**

As John correctly notes, coercion requires a showing that "the challenged activity . . . results from the State's exercise of coercive power." *Blum*, 457 U.S. at 1004. Here, the activity that John challenges is DU's finding that John engaged in sexual misconduct and DU's decision to expel him. *See* John's Brief, at 15, 54-55; *see also* (Aplt. App. at A315) ("DU failed to provide Plaintiff due process before

expelling him . . .").  To establish state action, John thus has to show DU's finding that he engaged in sexual misconduct and its decision to expel him were the result of the government's exercise of coercive power.  *See Blum*, 457 U.S. at 1003, 1004 (noting the importance of analyzing the precise action complained of).

The District Court properly found that John's arguments of coercion related to DU's receipt of federal funding fall short of making this showing.  The District Court explained, as an initial matter, that DU's receipt of federal funding alone cannot transform it into a state actor.  (Aplt. App. at A1463) (citing *Rendell-Baker*, 457 U.S. at 840); *see also Blum*, 457 U.S. at 1011.  In line with caselaw from around the country, the District Court then rejected John's related argument that coercion is established through DU's risk of losing federal funding if it failed to comply with Title IX.  (Aplt. App. at A1462-A1469) (citing *Heineke v. Santa Clara Univ.*, 2017 WL 6026248, at *15-16 (N.D. Cal. Dec. 5, 2017) and *Doe v. Case W. Res. Univ.*, 2017 WL 3840418, at *8-10 (N.D. Ohio Sept. 1, 2017))[6]; *see also Faparusi v. Case W. Res. Univ.*, 711 Fed. App'x 269, 275-76 (6th Cir. 2017) (rejecting the argument that coercion can be shown through the risk of defunding for failure to comply with

---

[6] Contrary to John's assertion, *Doe v. Case Western* did address the defunding argument he raises on appeal.  John's Brief at 53.  The plaintiff in *Case Western* specifically "allege[d] that the DCL threatened colleges with large de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under procedures and terms dictated by the federal government."  *Doe v. Case W. Res. Univ.*, 2017 WL 3840418, at *8-10.

Title IX); *Tsuruta v. Augustana Univ.*, 2015 WL 5838602, at *2 (D.S.D. Oct. 7, 2015); *see also Blum*, 347 U.S. at 1009-10 (noting that where regulations "do not dictate the decision" at issue, "penalties imposed for violating the regulations add nothing to respondents' claim of state action").

Instead, as the District Court correctly found, the proper state action inquiry in this context is whether the government participated in the Title IX proceedings at issue or dictated the outcome complained of. (Aplt. App. at A1465-A1467); *e.g.*, *Doe v. Case W. Res. Univ.,* 2017 WL 3840418, at *9 (finding no state action because "[t]here is no allegation here that the federal government participated in the proceedings against Plaintiff, or dictated the specific finding of responsibility in this case."). At least four other courts have considered this precise issue, and all have concluded the same. *Faparusi*, 711 Fed App'x at 275-76 (explaining the need to show "the federal government participated in the proceedings against the plaintiff, or dictated the specific finding of responsibility in this case" to show coercion) (citation omitted); *Heineke*, 2017 WL 6026248, at *16-17 (same); *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at * 9 (same); *see also Woytowicz v. George Washington Univ.*, 2018 WL 4078352, at *7, _ F. Supp. 3d._ (D.D.C. Aug. 27, 2018) (finding no state action from a private university's compliance with Title IX because the university exercised "broad discretion" in establishing its Title IX procedures and implementing them during the investigation at issue).

These decisions are in line with both the Supreme Court's definition of coercion and also with United States Supreme Court caselaw considering state actor arguments under similar facts.   In *Blum*, 457 U.S. 991, for example, the Supreme Court considered whether state action was present in private nursing homes' decisions to discharge or transfer Medicaid patients to lower levels of care.  *Id.* at 993-94.   The nursing homes, while private entities, were heavily regulated and received direct reimbursement from the State for the reasonable cost of services they provided.  *Id.* at 991, 1004, 1011.   Regulations required the nursing homes to periodically verify that their patients were receiving medically necessary services to justify the patient's continued receipt of their current level of care.  *Id.* at 991, 1006. Specifically, regulations required the nursing homes to: assess each patient's present need for care according to criteria dictated by the State; "make all efforts possible to transfer patients to the appropriate level of care or home;" and pay penalties if they failed to discharge or transfer patients whose continued stay was inappropriate.  *Id.* at 1005-07, 1006 n.15, 1007-11.

Despite this extensive regulation, the Court found that there was no state action because the specific actions complained of—patient discharges and transfers—were made by private physicians and nursing home administrators, not the State.  *Id.* at 1005, 1008-09; *see also Flagg Bros. v. Brooks*, 436 U.S. 149, 165 (1978) (finding no state action through encouragement where private parties took

actions the State "permits but does not compel"); *James v. Grand Lake Mental Health Ctr., Inc.*, 1998 WL 664315, at \*4 (10th Cir. Sept. 24, 1998).

**c)**    **The Proper Application of the Law Demonstrates That There Was No State Action.**

Here, the same analysis under *Blum* and the extensive cases detailed above demonstrates that the District Court's finding of no state action was correct.  John fails to allege that the federal government compelled DU's determination that he engaged in sexual misconduct or its decision to expel him. (*See* Aplt. App. at A1465.)  John further does not allege that the federal government participated in the Title IX proceedings against him.  Nor could he.  Indisputably, private parties at DU reached the conclusion that John violated DU's sexual misconduct policies and that he should be expelled.  *See Woytowicz*, 2018 WL 4078352, at \*7 (finding no state action because even though universities have to comply with Title IX, they exercise "ample discretion" in establishing Title IX policies and implementing them in particular investigations).   And as the District Court explained, the Dear Colleague Letter instructed universities that their inquiry into Title IX complaints "must in all cases be prompt, thorough, and impartial" and that complainants and respondents must be treated equally throughout the investigatory process.  (Aplt. App. at A1466); (citing the April 2011 Dear Colleague Letter, at 5, 11-13).

49

Because he is unable to make this showing, John confuses the analysis and argues that he should not be required to show that the government compelled a specific result because "[t]he whole point of delegation is that the ostensibly private party is the decision-maker and doing so as a state actor." John's Brief, at 53. As detailed in Section III.B. above, John's delegation argument fails for numerous reasons, and in any event, he cannot use this faulty delegation argument to circumvent the requirements for establishing state action under his theory that compliance with federal law compelled the actions in question.

Lacking favorable caselaw, John points to a 2017 speech given by Betsy DeVos. John's Brief, at 49. His quotation of her speech, however, states only that Washington pushed schools to establish structures to address sexual misconduct and that schools were "compelled by Washington to enforce ambiguous and incredibly broad definitions of assault and harassment." John's Brief, at 49. Even if her speech were authoritative, which it is not, it falls far short of establishing that the federal government dictated the outcome John complains of or that it was involved in the Title IX adjudication of his misconduct.

While John occasionally mentions the buzzwords of state action theories other than coercion and delegation, he provides no analysis and never explains how any additional theory of state action would apply to this case. John's Brief, at 46-56; (Aplt. App. at A311-A314.) As this Court explained in *Wilburn v. Mid-S. Health*

50

*Dev., Inc.*, 343 F.3d 1274, 1280-81 (10th Cir. 2003), it will not consider theories

discussed "in a vague and ambiguous way," or ones where the litigant fails to

articulate how the law applies to the case. *Id.* (citation omitted).

Even if John had presented additional theories, the evidence in this case would

not support a finding of state action. As with coercion, the theory of encouragement

requires a finding that the State compelled the specific result complained of. *E.g.*,

*Blum*, 457 U.S. at 1004 ("[A] State normally can be held responsible for a private

decision only when it has exercised coercive power or has provided such significant

encouragement . . . that the choice must in law be deemed to be that of the State.");

*see also Woytowicz*, 2018 WL 4078352, at *7. John cannot make this showing. A

theory of entwinement would also fail. Supreme Court cases finding entwinement

set a high bar for the level of governmental involvement that must be shown to turn

a private entity into a state actor. The facts that supported a determination of

entwinement in *Brentwood*, for example, were that 84% of the private institution's

membership was made up of public schools, and that public school officials "d[id]

not merely control but overwhelmingly perform[ed] all but the purely ministerial

acts by which the Association exists and functions in practical terms." *Brentwood

Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 299-300 (2001).

John has made no such showing here.

### d) The Cases Cited by the District Court Are Directly On Point.

In ruling on John's state action arguments, the District Court pointed to a large body of caselaw uniformly holding that private universities are not state actors by virtue of their compliance with Title IX regulations or the Dear Colleague Letter. (Aplt. App. at A1463-1469.)  John's efforts to distinguish these cases are unavailing.

John first quibbles with the District Court's reliance on *Heineke*, 2017 WL 6026248, at *14-16; John's Brief, at 51-52.  John notes, without explaining how it is significant, that the case involved a professor rather than a student.  John's Brief at 52.  This distinction is immaterial; the professor in *Heineke*, like John, was found responsible for violating the university's sexual misconduct policy, and he raised John's same claim that the university violated his Procedural Due Process rights in the Title IX adjudication.  *Heineke*, 2017 WL 6026248, at *14-15.

While John is correct that the professor in *Heineke* insufficiently pled the Due Process argument in his Complaint, the court nevertheless analyzed the argument at length.  *Id.* at *15-17.   Because the plaintiff did not allege that the federal government required the university to conduct the Title IX investigation in a particular way or come to a particular decision, the court concluded that the plaintiff's argument was simply that the federal government coerced the University by requiring general compliance with Title IX.  *Id.* at *16-17.  The court cited to

52

*Sutton v. Providence St. Joseph Medical Ctr.*, 192 F.3d 826, 837 (9th Cir. 1999) to reject the argument that compliance with generally-applicable federal laws, without additional evidence of coercion, could turn a private entity into a state actor. *Id.* at *16-17.  This well-reasoned decision is also in line with the numerous other cases the District Court analyzed.  (Aplt. App. at A1463-1467.)

John's attempt to distinguish *Faparusi*, 711 Fed. App'x 269—that the student in that case was disciplined for entering and taking pictures in women's bathrooms— adds nothing to his argument.  The conduct in *Faparusi* was in violation of the University's sexual misconduct policies, and the student, like John, argued that the University violated his Due Process rights in suspending him for this misconduct. 711 Fed. App'x, at 271.  *Faparusi*'s language rejecting the Due Process argument John advances here is squarely on point.  *Id.* at 275-76 (finding persuasive caselaw holding that coercion requires evidence that the federal government participated in the proceedings or dictated the specific finding of responsibility).

John attempts to distinguish *Tsuruta*, 2015 WL 5838602, by noting that the student there sought a preliminary injunction to stay the University's investigation of the allegations against him pending the resolution of his criminal charges for rape and sexual assault.  *Id.* at *1; John's Brief, at 55.  John is, however, unable to explain why this in any way undercuts the Court's analysis of the student's due process arguments.  To determine whether a preliminary injunction should be issued, the

53

court analyzed the same due process argument that John makes here: that a University is coerced and turned into a state actor through its receipt of federal funds that are contingent on compliance with Title IX's regulations. *Id.* at *2-3. The court ruled that it is regulations coercing a private school to act in a given way that create state action and correctly determined that this is not present where the federal government provides funding that requires compliance with Title IX regulations. *Id.* at *2-3. The case is soundly reasoned and directly on point.

Lastly, John briefly addresses the decisions in *Doe v. Washington & Lee University,* 2015 WL 4647996 and *Doe* v. *Case Western Reserve University*, 2017 WL 3840418, stating that these decisions are "inconsistent with U.S. Supreme Court case law." John's Brief, at 55-56. He does not flesh out this argument in any way or even point to which Supreme Court case he claims the decisions are in conflict with. *Id.* Nevertheless, as discussed above, these decisions are firmly in line with the decisions of other courts considering the same issue and with Supreme Court law.

### e)    John's "It Just Cannot Be" Policy Argument Also Fails.

Because John has no favorable caselaw to support his state actor argument, he argues on policy grounds, that it "just cannot be that private universities can adjudicate alleged sexual assault without fair notice and a hearing." John's Brief, at 54-55. John ignores a vital distinction, however: DU is not adjudicating criminal

sexual assault or any other crimes when it conducts Title IX investigations of campus policy violations.

**C.    The District Court Properly Declined Supplemental Jurisdiction Over John's State Law Claims.**

Because the District Court properly dismissed John's federal law claims, the District Court properly declined to exercise supplemental jurisdiction on his state law claims.

## <u>CONCLUSION</u>

For the reasons stated above, this Court should affirm the District Court's Order granting DU's motion for summary judgment.

**Dated:        October 22, 2018**

Respectfully submitted,

*s/* Jim Goh
_____
**Jim Goh**
E. Rayner Mangum
**CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**
600 17th Street, Suite 2700-S
Denver, CO  80202
Telephone:  720.343.7533
Facsimile:   720.343.7573

**ATTORNEYS FOR APPELLEE**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure,

I hereby certify that this Appellee's Brief was produced in Times New Roman (a

proportionally-spaced typeface), 14-point type and contains 12,971 words (based

on Microsoft Word processing system word count function).

**Dated: Denver, Colorado**
**October 22, 2018**

**CONSTANGY, BROOKS, SMITH &**
**PROPHETE, LLP**

<u>*s/* **Jim Goh**</u>
**Jim Goh**
**Rayner Mangum**
**600 17th Street, Suite 2700-S**
**Denver, CO  80202**
**Telephone:  720.343.7533**
**Facsimile:   720.343.7573**

***Attorney for Defendant-Appellee***

## <u>CERTIFICATE OF PRIVACY REDACTIONS</u>
## <u>PURSUANT TO 10TH CIR. R. 25.5</u>

I hereby certify that, per the Court's Rules, all redactions have been made

(SSNs, birth dates, financial account numbers, etc.) to the Appellee's Brief.

**Dated: Denver, Colorado**
**October 22, 2018**

**CONSTANGY, BROOKS, SMITH &**
**PROPHETE, LLP**

*s/* **Jim Goh**
**Jim Goh**
**Rayner Mangum**
**600 17th Street, Suite 2700-S**
**Denver, CO  80202**
**Telephone:  720.343.7533**
**Facsimile:  720.343.7573**

*Attorney for Defendant-Appellee*

57

## <u>CERTIFICATE OF IDENTICAL HARD COPY</u>

I hereby certify that the PDF of the Appellee's Brief is identical to the

printed hard copies.

**Dated: Denver, Colorado**
**October 22, 2018**

**CONSTANGY, BROOKS, SMITH &**
**PROPHETE, LLP**

*s/* **Jim Goh**
**Jim Goh**
**Rayner Mangum**
**600 17th Street, Suite 2700-S**
**Denver, CO  80202**
**Telephone:  720.343.7533**
**Facsimile:  720.343.7573**

***Attorney for Defendant-Appellee***

58

## <u>CERTIFICATE OF VIRUS SCAN</u>

I hereby certify that, per the Court's Rules, a virus-detection program was run on the electronic Appellee's Brief, and no virus was detected. The program used was System Center Endpoint Protection, Antimalware Client Version 4.7.214.0, and most recently updated on October 22, 2018.

**Dated: Denver, Colorado**
**October 22, 2018**

**CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**

<u>*s/* **Jim Goh**</u>
**Jim Goh**
**Rayner Mangum**
**600 17th Street, Suite 2700-S**
**Denver, CO  80202**
**Telephone:  720.343.7533**
**Facsimile:   720.343.7573**

***Attorney for Defendant-Appellee***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 22, 2018, I electronically filed the foregoing

Appellee's Brief with the Clerk of the Court for the United States Court of Appeals

for the Tenth Circuit through the Court's CM/ECF system.

I further certify that the participants in this case are registered CM/ECF

users, and service will be accomplished by the appellate CM/ECF system.

**Dated: Denver, Colorado**
**October 22, 2018**

**CONSTANGY, BROOKS, SMITH &**
**PROPHETE, LLP**

*s*/ **Jim Goh**
**Jim Goh**
**Rayner Mangum**
**600 17th Street, Suite 2700-S**
**Denver, CO  80202**
**Telephone:  720.343.7533**
**Facsimile:   720.343.7573**

*Attorney for Defendant-Appellee*

60